UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VALERIE APONTE MARTINEZ,    )
       Plaintiff,      )
             )
             )
      v.          )    Civil No. 3:20-cv-30151-KAR
             )
             )
KILOLO KIJAKAZI,       )
Acting Commissioner of the Social    )
Security Administration,[1]    )
       Defendant.    )
             )

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION TO AFFFIRM THE COMMISSIONER'S DECISION
(Dkt Nos. 19 and 27)

ROBERTSON, U.S.M.J.

**I.  Introduction and Procedural History**

Valerie Aponte Martinez ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Commissioner of Social Security ("Commissioner")

denying her application for Social Security Disability Insurance Benefits ("DIB").[2]  Plaintiff

protectively applied for DIB on April 14, 2017, alleging an onset date of August 1, 2016 (A.R.

29, 476-77).[3]  Plaintiff claimed disability due to herniated disc, carpal tunnel both hands,

---

[1] On July 9, 2021, Kilolo Kijakazi was appointed as Acting Commissioner of the Social Security Administration by President Joseph R. Biden.  Under Federal Rule of Civil Procedure 25(d), she is automatically substituted as the defendant in this case.

[2] Plaintiff also applied for Supplemental Security Income ("SSI"), but she did not appeal that denial to the ALJ, so it is not before this court.

[3] A transcript of the Social Security Administration Official Record ("A.R.") has been filed with the court under seal (Dkt. No. 13).  Citations to the A.R. page numbers are those assigned by the agency and appear on the lower right-hand corner of each page.

anxiety/depression, rupture disc, and fibromyalgia (A.R. 493).  Her application was denied

initially (A.R. 409-411) and on reconsideration (A.R. 413-16).  She requested a hearing before

an Administrative Law Judge ("ALJ") (A.R. 417-18), and one was held on February 15, 2019

(A.R. 306-344).  On September 10, 2019, the ALJ issued an unfavorable decision (A.R. 26-47).

Plaintiff sought review by the Appeals Council (A.R. 21-25), which denied relief (A.R. 1-7).

Thus, the ALJ's decision became the final decision of the Commissioner, and this suit followed.

Plaintiff appeals from the ALJ's decision on the grounds that the ALJ erred in evaluating

the opinion of Plaintiff's primary care physician, Saad W. Usmani, M.D., and erred in finding

that Plaintiff was able to perform her past relevant work as a telephone operator based on a

hypothetical question posed to the vocational expert that did not match the residual functional

capacity assessment adopted in the ALJ's decision.  Pending before this court is Plaintiff's

motion for judgment on the pleadings (Dkt. No. 19) and Defendant's motion for an order

affirming the Commissioner's decision (Dkt. No. 27).  The parties have consented to this court's

jurisdiction (Dkt. No. 16).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated

below, the court allows Plaintiff's motion and denies the Commissioner's motion.

## II.    Legal Standards

### A.  Standard for Entitlement to DIB

In order to qualify for DIB, a claimant must demonstrate that she is disabled within the

meaning of the Social Security Act.[4]  The term "disability" means "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

---

[4] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB, *see* 42
U.S.C. § 423(a)(1)(A).

last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration. *See* 20 C.F.R. § 404.1520(a)(4)(i-v). The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's residual functional capacity ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to

> which an individual's medically determinable impairment(s),
> including any related symptoms, such as pain, may cause physical
> or mental limitations or restrictions that may affect his or her
> capacity to do work-related physical and mental activities.

Social Security Ruling 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations. *Goodermote*, 690 F.2d at 7.

B.  Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (mem.) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51,

4

56 (1st Cir. 2003)).  In applying the substantial evidence standard, the court must be mindful that

it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve

conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F.

App'x. at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters

entrusted to experts.  *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

## III.    Relevant Facts

### A.  Plaintiff's Background

Plaintiff was forty-one years old on the date of the hearing before the ALJ (A.R. 312).

She has a G.E.D. and obtained a certification in medical interpretation (A.R. 312-13).  She has

worked as a salesclerk, an assistant manager, a mail carrier, and a telephone answering service

operator (A.R. 337-38).

### B.  Medical Records Relevant to Plaintiff's Claims[5]

On September 15, 2016, Plaintiff presented to her primary care physician, Saad W.

Usmani, M.D., for an annual physical (A.R. 713-19).  At the time, she reported low back pain

and overall body aches (A.R. 713).  Upon physical examination, Dr. Usmani noted that Plaintiff

appeared in no apparent distress (A.R. 716).  She had normal range of motion in her back,

although she exhibited significant tenderness to palpation on bilateral lower lumbar paraspinal

(or facet joints) and spinal region and minimal tenderness to palpation of bilateral S1 joint (A.R.

717).  She had negative straight leg tests bilaterally (A.R. 717).  The results of a Phalen's test

were positive bilaterally (A.R. 717).  The remainder of her examination was benign (A.R. 716-

---

[5] Plaintiff does not dispute the ALJ's evaluation of the evidence as it relates to her alleged mental impairments, nor does she argue that the RFC determination is deficient in this regard. Therefore, only her treatment that is relevant to her alleged physical impairments is summarized here.

17).  Dr. Usmani's recommended treatment for Plaintiff's low back pain consisting of high-dose NSAIDs, the application of heat a few times a day, and a four-week course of physical therapy (A.R. 718).  Dr. Usmani ordered bloodwork in connection with Plaintiff's reported body aches and prescribed night splints for her bilateral carpal tunnel syndrome (A.R. 718).

Plaintiff began a course of physical therapy a few days later as indicated by Dr. Usmani (A.R. 1078-86).  At her second visit on September 27, 2016, Plaintiff reported that her pain was "not too bad," and rated it a four on a ten-point scale (A.R. 1081).  At her third visit on September 29, 2016, Plaintiff reported slightly increased pain of a six on a ten-point scale, but her physical therapist assessed decreased symptoms after treatment (A.R. 1079).  Her course of physical therapy was discontinued, however, because Plaintiff failed to follow up for further appointments (A.R. 1078).

Plaintiff saw Dr. Usmani again on March 20, 2017, for joint aches and pains predominantly involving her hands, knees, and ankles (A.R. 720-24).  Again, she presented in no apparent distress (A.R. 723).  Her musculoskeletal examination revealed joint and back pain, and hand tenderness and crepitation (A.R. 723).  Dr. Usmani's impression was polyarthralgia with swelling of the left middle finger along with bilateral wrist pain along the radial aspect (A.R. 723).  He indicated that she probably had underlying arthritis at least in her knee joints and referred her to Arthritis Treatment Center for further input (A.R. 724).

On April 2, 2017, Plaintiff presented to Mercy Medical Center Emergency Department complaining of left breast pain (A.R. 645-658).  Plaintiff was in no acute distress and was ambulating independently without an assistive device (A.R. 646, 648).

Two days later on April 4, 2017, Plaintiff was seen for the first time by Donald R. Griger, M.D., at Arthritis Treatment Center for a chief complaint of chronic diffuse pain (A.R. 660-64).

6

Plaintiff reported arthritis impact of an eight on a ten-point scale (A.R. 660). She reported

morning stiffness that lasts up to all day as a problem persisting for several years but denied that

the pain was getting worse (A.R. 660). While Plaintiff reported being able to dress, get in and

out of bed, and get in and out of a car without difficulty, she had some difficulty walking

outdoors on flat ground and washing and drying her entire body, much difficulty lifting a full cup

or glass to her mouth and bending down to pick up clothing, and was unable to turn taps on and

off (A.R. 660). Plaintiff indicated that she experienced intermittent numbness and tingling in

both of her hands but reported wearing wrist braces periodically with some benefit (A.R. 660).

A lumbar spine MRI a few years earlier revealed degenerative disc disease and recent x-rays of

her knees and hands were unremarkable except for minimal osteoarthritis involving both knees

(A.R. 660-61). Indomethacin provided significant pain relief, but she only took it at night

because it caused tiredness; Plaintiff also reported that physical therapy and acetaminophen

provided some pain relief (A.R. 661). Dr. Griger's review of Plaintiff's systems was positive for

fatigue, muscle weakness, ankle joint swelling, muscle aches and tenderness, recurrent episodes

of dizziness, and numbness/tingling (A.R. 662). Plaintiff presented as well-appearing and in no

apparent distress and with a normal gait (A.R. 662). She exhibited full range of motion of all

joints with pain at the extremes globally, pain at the extremes of spine motion at all levels, and

diffuse paraspinal muscle tenderness to palpation, but no muscle atrophy (A.R. 662-63). Her

strength was normal and symmetric and light touch sensation was intact in all four extremities

(A.R. 663). Finally, her deep tendon reflexes in the upper and lower extremities were normal

and symmetric (A.R. 663). Dr. Griger found no evidence of active inflammatory arthritis or

other inflammatory autoimmune systemic rheumatologic condition, but Plaintiff did appear to

have multiple features of fibromyalgia syndrome (A.R. 663). Plaintiff was interested in

considering a new fibromyalgia medicine, but Dr. Griger advised her that he did not prescribe

neuropsychiatric medications, and she should follow-up with her primary care physician (A.R.

664).  Dr. Griger's plan included taking x-rays of her most bothersome peripheral joints to

evaluate for clinically significant bone or joint abnormalities, continuation of her current

medications, and a follow-up visit in two weeks (A.R. 664).

Plaintiff returned for a follow-up visit with Dr. Griger on April 13, 2017 (A.R. 665-668).

She reported that she continued to experience chronic diffuse pain and fatigue, but that

acetaminophen and indomethacin provided some pain relief and she tolerated them well (A.R.

665).  She further reported experiencing morning stiffness lasting for greater than four hours,

which had been a major problem for six months (A.R. 665).  She denied joint swelling or

inflammation (A.R. 665).  She stated that she used to exercise regularly on an elliptical trainer at

her home but that she had stopped approximately six months earlier (A.R. 665).  She reported

that she felt better when she wore supportive footwear but continued to wear non-supportive

shoes such as flip-flops (A.R. 665).  Additionally, she indicated that she continued to experience

bilateral carpal tunnel symptoms but that they resolved when she wore her wrist braces at night

(A.R. 665).  Upon examination, Plaintiff was well-appearing and in no apparent distress with a

normal gait (A.R. 666).  She had full range of motion in all her joints, with mild diffuse upper

and lower extremity myofascial tenderness to palpation, pain throughout spine motion all levels,

and diffuse paraspinal muscle tenderness to palpation (A.R. 667).  Phalen's and Tinel's tests

were negative at both wrists (A.R. 667).  Plaintiff indicated that she was not interested in

physical therapy or corticosteroid injections for her carpal tunnel syndrome (A.R. 667).  Dr.

Griger encouraged Plaintiff to wear more supportive footwear and to engage in regular low-

impact exercise (A.R. 667).  Plaintiff indicated that she planned to resume exercise on her

elliptical trainer and would follow-up with Dr. Usmani to discuss pharmacologic treatment for her fibromyalgia syndrome (A.R. 668). Dr. Griger recommended that Plaintiff return for a follow-up in four weeks (A.R. 667).

On May 4, 2017, Plaintiff met with Dr. Usmani for anxiety (A.R. 725-729). Plaintiff was in no apparent distress, and review of systems was negative for respiratory, cardiovascular, musculoskeletal, or neurological issues (A.R. 728).

Plaintiff followed up with Dr. Griger on May 11, 2017 (A.R. 669-672). Plaintiff reported morning stiffness that lasted up to one hour (A.R. 669). She continued to experience chronic diffuse pain and fatigue, with her low back tending to be her most bothersome area but denied that the pain was getting worse (A.R. 669). She indicated that she continued to experience bilateral carpal tunnel symptoms; she reported that the symptoms improved when she wore braces but reported doing so only periodically (A.R. 669). Her medications continued to provide a modest benefit (A.R. 669). Plaintiff persisted in wearing non-supportive footwear but had started using her elliptical trainer for approximately ten minutes every other day (A.R. 669-670). Once again, Plaintiff was well-appearing and in no acute distress with a normal gait (A.R. 671). She had full range of motion in all joints (A.R.671). She exhibited mild diffuse upper and lower extremity myofascial tenderness to palpation, low back pain at terminal lumbar flexion and extension, and diffuse paraspinal muscle tenderness to palpation (A.R. 671). Phalen's and Tinel's testes remained negative at both wrists (A.R. 671). Plaintiff continued to decline physical therapy and corticosteroid injections (A.R. 672). Dr. Griger urged Plaintiff to wear her wrist braces every night and avoid repetitive or strenuous use of her hands, to increase her aerobic exercise to at least 15 minutes daily, and to avoid non-supportive footwear for low back

and lower extremity pain (A.R. 672).  Plaintiff was to return for a follow-up in three weeks (A.R. 672).

Plaintiff also saw a therapist on May 11, 2017 (A.R. 679-690).  Plaintiff indicated that she was unemployed; she wanted to work part-time; however, after finding part-time employment, her employer was giving her a full-time schedule, which was causing her pain to flare up (A.R. 680).  As a result, she quit the job after about five weeks (A.R. 680).

Plaintiff met with Dr. Usmani again on July 6, 2017 (A.R. 730-734).  Plaintiff reported that routine stresses were a trigger for fibromyalgia (A.R. 730).  Dr. Usmani noted that he had prescribed Savella for fibromyalgia, but it was not covered by her insurance; she was given amitriptyline but was unable to tolerate more than 25 mg due to palpitations (A.R. 730).  She had tried Cymbalta in the past but was limited by facial numbness and swelling (A.R. 730).  Plaintiff was in no apparent distress, review of systems was normal, and her overall condition was unchanged (A.R. 732-734).  Dr. Usmani planned to give Plaintiff a trial of cyclobenzaprine, with Plaintiff to follow-up in two months (A.R. 734).

Plaintiff returned for her follow-up with Dr. Usmani on September 7, 2017 (A.R. 792-796).  Plaintiff reported worsening low back pain, but denied radiation to her lower extremities, tingling, numbness, or weakness (A.R. 792).  Plaintiff found that the cyclobenzaprine had provided some benefit, improving her pain from a seven to a four or five on a ten-point scale, but she had reverted to taking amitriptyline 25 mg, which seemed to be helping by allowing her a restful sleep and improved fibromyalgia symptoms in the morning (A.R. 792).  Plaintiff was in no apparent distress (A.R. 795).  She exhibited tenderness to palpation of her lower lumbar paraspinal region, but her examination was otherwise benign (A.R. 796).  Dr. Usmani attributed Plaintiff's acute low back pain to a flareup of her degenerative arthritis with a superimposed

flareup of fibromyalgia (A.R. 796).  He indicated that her fibromyalgia was worsening and planned to increase cyclobenzaprine along with amitriptyline, with a follow-up in six weeks (A.R. 796).

Plaintiff saw Dr. Usmani on November 17, 2017, for medication management related to her mental impairments (A.R. 917-921).  Plaintiff appeared in no apparent distress and had a normal gait, coordination, and motor strength (A.R. 920-921).

On January 25, 2018, Plaintiff met with Bryan A. Chaplin, PA-C, for right elbow pain that had persisted for approximately two months and which she rated a 5/10 in intensity (A.R. 1091-1092).  She reported that both ibuprofen and an elbow sleeve seemed to offer some relief (A.R. 1091).  Plaintiff was in no apparent distress with full range of motion of her elbow without significant pain, mild pain with wrist flexion, tenderness in her forearm muscles, and full sensation (A.R. 1091).  Mr. Chaplin diagnosed Plaintiff with right elbow medial epicondylitis and recommended a topical gel, physical therapy, and continued use of the elbow sleeve, with a follow-up in eight to ten weeks (A.R. 1092).

On February 8, 2018, Plaintiff saw Dr. Usmani in follow-up for her right elbow pain and mental impairments (A.R. 1124-1128).  Plaintiff was in no apparent distress and her gait, coordination, and motor strength were all within normal limits (A.R. 1128).  Her elbow was improving, and Dr. Usmani gave her a prescription for physical therapy (A.R. 1128).

Plaintiff went to Mercy Medical Center Emergency Department on February 22, 2018, for chest and left arm pain, which she rated an 8/10 in intensity (A.R. 1157-1177).  Plaintiff denied any back pain (A.R. 1158).  Her examination, EKG, and bloodwork were all normal (A.R. 1159, 1162).  It was noted that the pain was probably musculoskeletal in nature and most likely an exacerbation of fibromyalgia (A.R. 1162).

On March 12, 2018, Plaintiff followed-up with Dr. Usmani regarding her non-cardiac chest pain and right elbow pain (A.R. 1115-1119).  She noted that her chest pain had subsided, and she was experiencing only residual symptoms of her right elbow pain (A.R. 1115).  Upon examination, Plaintiff was in no apparent distress and had normal gait, coordination, and motor strength (A.R. 1119).  Dr. Usmani planned to refer Plaintiff to New England Orthopedics for a cortisone injection for her elbow (A.R. 1119).

Plaintiff saw Mr. Chaplin again on March 22, 2018 (A.R. 1088-1090).  Plaintiff reported that she participated in physical therapy with improvements in pain, which she presently rated a 3/10 in intensity, and that it responded well to Motrin and activity modification (A.R. 1088).  Upon examination, Plaintiff was in no apparent distress and had full elbow range of motion without pain and only mild medial epicondylar tenderness (A.R. 1088).  Mr. Chaplin noted significant improvements with therapy and advised Plaintiff to continue her home exercise program, use of anti-inflammatory medications intermittently, and use of her brace (A.R. 1088).

Plaintiff saw Dr. Usmani on October 2, 2018, for her annual physical (A.R. 1241-1247).  She reported that for the previous two weeks she had been noticing worsening generalized body aches with accompanying fatigue due to poor sleep (A.R. 1241).  She also noted cloudy and malodorous urine for the previous few days (A.R. 1242).  She was in no apparent distress and had full range of motion in her back (A.R. 1245).  While she had multiple positive trigger points of fibromyalgia and heightened sensitivity to light touch, she had no joint swelling, deformity, instability, or limitation of motion (A.R. 1245-1246).  Her gait, coordination, and motor strength were all within normal limits (A.R. 1246).  Dr. Usmani's impression was of worsening fibromyalgia, although he indicated he would need to rule out secondary causes (A.R. 1246).  Dr. Usmani advised Plaintiff to discontinue amitriptyline, and he would start her on a trial of

gabapentin 300 mg at bedtime (A.R. 1246).  He also indicated a need to rule out a urinary tract infection with a urine analysis and culture (A.R. 1246).  Plaintiff was to follow-up in two months (A.R. 1247).

Plaintiff went to the Emergency Department at Mercy Medical Center later that day for cloudy urine and a sharp, 8/10 pain radiating around her right groin toward her right flank (A.R. 1179-1192).  Plaintiff denied back pain (A.R. 1180).  Plaintiff's cardiovascular, respiratory, musculoskeletal, and neurologic review of systems were all normal (A.R. 1180-81).  Plaintiff was diagnosed with a urinary tract infection (A.R. 1183).

Plaintiff followed-up with Dr. Usmani on December 4, 2018, for her fibromyalgia, anxiety, and depression (A.R. 1226-1240).  Plaintiff noted that the gabapentin 300 mg at bedtime had provided transient improvement of her fibromyalgia, but that her symptoms had been worsening lately with generalized body aches (A.R. 1226).  Her lab results were negative except for a vitamin D deficiency for which she was being treated with therapeutic replacement (A.R. 1226).  Plaintiff appeared in no apparent distress and her gait, coordination, and strength were all within normal limits (A.R. 1226).  Dr. Usmani assessed Plaintiff with fibromyalgia aggravated secondary to underlying stress and worsening depression (A.R. 1227).  He planned to increase her gabapentin by 300 mg every week up to one capsule three times per day (A.R. 1227).

On January 3, 2019, Plaintiff met with Dr. Usmani in four-week follow-up of her fibromyalgia, depression, and anxiety (A.R. 1219-1225).  Plaintiff reported that she had increased her gabapentin to one capsule of 300 mg twice per day, that she was tolerating it well, and that it was somewhat helping with the pain (A.R. 1219).  Plaintiff appeared in no apparent distress and her gait, coordination, and strength were all within normal limits (A.R. 1219).  Dr. Usmani assessed Plaintiff with some mild subjective improvement of her fibromyalgia

symptoms and advised her to continue with 300 mg gabapentin in the morning and titrate to 600

mg at night (A.R. 1219).

   C.  <u>Function Reports</u>

   Plaintiff completed a function report on August 3, 2017 (A.R. 516-523).  While Plaintiff

noted limitations with walking and using her hands, she did not allege any limitations with sitting

or standing (A.R. 521).  Her reported normal daily routine included meal preparation, 30 minutes

of housework, doing laundry, and running errands (A.R. 516).  Plaintiff indicated that she was

able to perform her own self-care and care for her son, including washing his clothes, preparing

his meals, and cleaning his room (A.R. 517).  Plaintiff stated that her meal preparation included

complete meals and that it could take her anywhere from 5 to 30 minutes; she reported needing

help opening jars and getting items and that baking was limited due to all the hand work

involved (A.R. 518).  According to Plaintiff, she could sweep, mop, and do laundry, but needed

15-minute breaks between rooms when mopping and help carrying the laundry (A.R. 518).  She

reported going outside only when necessary, which she approximated at two to three times per

week (A.R. 519).  Plaintiff was able to drive and go out alone sometimes (A.R. 519).  She

shopped for herself and her son and could grocery shop for up to 1.5 hours if she had help with

the bags (A.R. 519).  Plaintiff advised that she enjoyed couponing, watching television, and

baking and canning once every two months (A.R. 520).

   Plaintiff filled out another function report on October 13, 2017 (A.R. 558-565).  Plaintiff

continued to report limitations in using her hands but did not indicate that her conditions had any

effect on her ability to stand, walk, or sit (A.R. 563).  She described a similar daily routine and

reported no problems with personal care (A.R. 558-559).  She stated that she no longer had the

ability to do event planning or to bake (A.R. 562).

D. <u>Hearing Testimony</u>

Plaintiff and vocational expert Zachary Fosberg ("VE") testified at the February 15, 2019, administrative hearing.

Plaintiff testified that she injured her lower spine in 2015, while working as an assistant manager at Rite Aid (A.R. 315, 317, 321). She reported that she continued to experience lower back pain, which travels down her left leg (A.R. 323). She described the pain as feeling like someone is pinching a nerve and leaving it pinned and explained that the pain comes and goes depending on her level of activity (A.R. 323). According to Plaintiff, normal activities like sweeping a room trigger the pain, and it requires her to take pain medication, which puts her to sleep for about an hour (A.R. 323). Plaintiff testified that physical therapy did not help and instead aggravated her back pain, that surgery is not an option, and that she uses a TENS unit to help ease the pain (A.R. 324-325).

Plaintiff also described pain in her knees from going up and down stairs, for which she takes Tylenol Arthritis (A.R. 325).

Plaintiff indicated that she has been diagnosed with fibromyalgia (A.R. 325). Plaintiff explained that when the fibromyalgia flares, the pain starts at the top of her neck and then travels to her whole body; the pain can be severe enough that sometimes she cannot walk because her ankles and feet hurt (A.R. 325). The fibromyalgia also attacks her wrist joints (A.R. 325-326). She described taking gabapentin for treatment of the fibromyalgia pain, which she also said causes drowsiness. According to Plaintiff, she experiences fibromyalgia flares approximately two times per month lasting about three days at a time (A.R. 326). In addition to the flare-ups, Plaintiff described constant fibromyalgia pain ranging from mild to high depending on her

activity level (A.R. 326).  Plaintiff indicated that she had swelling in her ankles approximately

one month earlier, but that her doctor had not yet determined the cause (A.R. 326).

Plaintiff testified that she has carpel tunnel syndrome in both hands, resulting in pain,

numbness, and a tingling sensation that starts in her thumbs and travels to her wrists and up to

her elbows (A.R. 326-327).  She has been prescribed splints to wear, takes Tylenol for the pain,

and does a variety of hand exercises at home (A.R. 327).  As a result of her carpal tunnel

syndrome, Plaintiff is unable to open bottles or jars, but she is still able to manipulate zippers or

buttons and pick up small objects (A.R. 328).

Regarding her pain medications, Plaintiff stated that they take the edge off but do not

eliminate the pain, and they cause her to become tired and need to sleep (A.R. 328-329).

Plaintiff stated that cold or wet weather aggravates the pain in her joints, especially her feet

(A.R. 329).  Plaintiff testified that she could sit for 15 to 20 minutes at a time, stand for 30

minutes at most, and walk for 15 minutes before needing to take a break (A.R. 329-330).

Plaintiff reported sleeping for approximately four hours per night before getting up for

approximately one-and-a-half hours and going back to sleep for an additional hour (A.R. 332-

333).  However, Plaintiff stated that she can take a medication to help her sleep through the night

(A.R. 333).  Plaintiff testified that she still feels tired when she gets up in the morning (A.R.

333).  She has both good and bad days and considers herself lucky if she has three good days in a

week (A.R. 334).

When it was time for the VE to testify, the ALJ asked him to assume a hypothetical

individual with Plaintiff's characteristics, who was limited to light work; who could no more

than occasionally bend, twist, crouch, crawl, or kneel; who could not tolerate concentrated

exposure to dust, fumes, strong odors, temperature, or humidity extremes; who could sit up to

50% of the time without having to come off task to do so; and who could not work at heights or around machinery (A.R. 339). The VE testified that such an individual could perform Plaintiff's previous work as a telephone answering service operator (A.R. 339-340). The ALJ then added to that hypothetical the additional restriction that the individual was limited to simple rote tasks, which would be taught by demonstration with rare changes in routine and no more than an occasional need to interact with coworkers and supervisors and no need to interact with the public (A.R. 340). The VE testified that such an individual could not perform Plaintiff's previous work as a telephone operator, but could perform work as a sorter, an inspector, or an assembler (A.R. 340). The VE provided national numbers of such jobs reduced by one-half to include positions where the essential job duties could be performed from a seated or standing posture (A.R. 340). Those numbers were approximately 20,000 jobs for a sorter, 20,000 jobs as an inspector, and 25,000 jobs as an assembler (A.R. 340). The ALJ then imposed an additional limitation of no more than occasional forceful grasping and twisting (A.R. 340). The VE testified that the three positions he had already identified would still be available without any further erosion in numbers of positions (A.R. 341). The ALJ then posed a new hypothetical in which the individual has all the same non-exertional limitations as already imposed but is limited to sedentary work and can stand on an as-needed basis without having to come off task to do so (A.R. 341). The VE testified that such an individual could perform work as a labeler, a sedentary inspector, and a sedentary assembler (A.R. 341-342). The VE provided national numbers of 15,000 each for jobs as a labeler or sedentary inspector, which figures were reduced by one-third to include positions where the essential job duties could be performed from a seated or standing posture; the VE reduced the national number of jobs for sedentary assembler to approximately one-half to 10,000 to account not only for the need to sit or stand at will, but also

the limitation with the upper extremities (A.R. 342).  The VE further testified that if the same

individual was limited to frequent but less than constant, or no more than occasional push-pull

motions requiring the flexing of her elbow with her right dominant arm, there would not be any

additional erosional effect on the numbers of positions he cited in the light or sedentary

categories (A.R. 342-43).  However, the VE testified that if the hypothetical individual was late

arriving, early leaving, or totally absent at least three times per month, there would be no jobs in

the national economy that would tolerate that limitation (A.R. 343).  Additionally, if the

hypothetical individual would be off task at least 15% of the time over and above normal breaks,

there would be no jobs in the national economy that would tolerate that limitation (A.R. 343-

344).  The VE testified that in his vocational opinion, the highest tolerable amount for the person

to be off task would be 10% (A.R. 344).

     E.  <u>Opinion Evidence Regarding Plaintiff's Physical Condition</u>

       *1.  State Agency Findings and Opinions*

On August 4, 2017, Elaine Hom, M.D., completed a physical residual functional capacity

assessment of Plaintiff.  Dr. Hom found that Plaintiff could occasionally lift or carry 20 pounds,

frequently lift or carry 10 pounds, and stand, walk, or sit for about six hours in an eight-hour

workday (A.R. 360).  Dr. Hom determined that Plaintiff could occasionally climb ramps/stairs;

climb ladders, ropes, or scaffolds; balance; stoop; kneel; crouch; and crawl (A.R. 361).  She

assessed no manipulative, visual, or communicative limitations, and the only environmental

limitation was that Plaintiff avoid concentrated exposure to hazards (A.R. 361).

On February 6, 2017, Dr. M.A. Gopal, M.D., completed another physical residual

functional capacity assessment of Plaintiff.  Dr. Gopal's assessment was the same as Dr. Hom's

in all respects (A.R. 378-380).

### 2.  *Treating Source Opinion*

On February 6, 2019, Dr. Usmani completed a medical source statement (A.R. 1263-64). Dr. Usmani opined that Plaintiff could lift and carry 10 pounds on an occasional basis and less than 10 pounds on a frequent basis (A.R. 1263).  He found that Plaintiff needed to shift at will from sitting or standing/walking and could stand and walk for about 3 hours per day and sit for about 4 hours per day (A.R. 1263).  Plaintiff could sit for only 15 minutes and stand for only 15-20 minutes before needing to change position (A.R. 1263).  Plaintiff would also need to be able to walk around every 60 minutes for 30 minutes at a time (A.R. 1263).  Finally, Plaintiff would sometimes need to lie down at unpredictable intervals every 30-60 minutes (A.R. 1263).  The medical findings that Dr.  Usmani indicated supported these limitations included: (1) multiple triggerpoint tenderness from fibromyalgia; (2) lumbar tenderness to palpation with limited range of motion; (3) apparent discomfort sitting in one position during the visit; and (4) reproduceable signs for carpal tunnel syndrome (A.R. 1263).  Dr. Usmani opined that Plaintiff could only occasionally stoop or climb stairs and could never twist, crouch, or climb ladders because she had a restricted range of motion of her spine (A.R. 1264).  Dr. Usmani found that Plaintiff could not reach (including overhead), push/pull, or handle (gross manipulation) because of her fibromyalgia and carpal tunnel syndrome.  According to Dr. Usmani, the medical findings supporting these limitations consisted of (1) tenderness to palpation of her lumbar spine; and (2) backpain from arthritis.  Dr. Usmani indicated that Plaintiff should avoid all exposure to extreme cold and high humidity (A.R. 1264).  Finally, he opined that Plaintiff would miss more than four days of work per month due to her impairments or treatment (A.R. 1264).

F.   The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis

required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since her alleged onset date (A.R. 31).  At the second step, the ALJ

found that Plaintiff had a combination of severe impairments consisting of "arthralgias in

multiple sites likely secondary to fibromyalgia, cervicalgia, carpal tunnel syndrome,

osteoarthritis of the bilateral knees, and intervertebral lumbar disc disease with pain at the

lumbar and thoracic levels" (A.R. 32).  At step three, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled the severity of one of

the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. 32).  Before

proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 C.F.R. 404.1567(b) including frequently
> lifting ten pounds, occasionally lifting twenty pounds and sitting, standing and
> walking six hours during an eight-hour workday, but would be limited to no
> more than occasionally bending, twisting, crouching, crawling or kneeling and
> would need to be permitted to sit, on an as needed basis up to 50% of the time
> without having to come off task to do so.  The work should not expose the
> incumbent [sic] to concentrations of dust, fumes, strong odors, temperature or
> humidity extremes, nor to hazards of working at heights or around moving
> machinery.  Forceful grasping and twisting with the bilateral hands and wrists
> is limited to frequent, but less than constant.

(A.R. 39).  At step four, the ALJ determined that Plaintiff was able to perform past relevant work

as a telephone answering operator and, therefore, was not disabled (A.R. 39).  The ALJ also

made an alternate step five finding relying on the VE's testimony to find that Plaintiff would be

capable of  performing work as a labeler with 15,000 jobs nationwide (reduced by 1/3 to account

for sit/stand limitation), an inspector with 15,000 jobs nationwide, and an assembler with 10,000

positions nationwide (reduced by 50% for handling restrictions), "even if additional limitations

of simple rote tasks, taught by demonstration, with rare changes in routine, and only requiring

occasional interaction with co-workers and supervisors, and no interaction with the public to

perform the tasks of the job, in a sedentary position, that permitted standing, an as needed basis,

up to 50% of the time were imposed, and required no more than frequent but less than constant

flexing of the right elbow" (A.R. 40).

IV.    **Analysis**

A.    The ALJ's Evaluation of the Treating Physician's Opinion

Plaintiff argues that the ALJ erred in not giving controlling weight to Dr. Usmani's

opinions concerning her functional limitations as expressed in the February 6, 2019, medical

source statement.  For support, Plaintiff cites to 20 C.F.R. § 404.1527(c)(2), which provides that

medical opinions from treating sources will be given controlling weight if the "treating source's

medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §

404.1527(c)(2).  Plaintiff's reliance on 20 C.F.R. § 404.1527(c)(2) is inapposite, as it applies

only to claims filed before March 27, 2017.  For claims filed on or after that date – Plaintiff's

claim was protectively filed on April 14, 2017 – the rule in 20 C.F.R. § 404.1520c applies (A.R.

29, 476-77).

Under the new rule, the agency does "not defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s) … including those from [the claimant's]

medical sources."  20 C.F.R. § 404.1520c(a).  Instead, the new regulations direct the ALJ to

evaluate the persuasiveness of each medical opinion by considering five enumerated factors,

which include: (1) supportability; (2) consistency; (3) the source's relationship with the claimant

(including length of the treatment relationship, frequency of examinations, purpose of the

treatment relationship, extent of the treatment relationship, and examining relationship); (4) the source's specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion ...." 20 C.F.R. § 404.1520c(c).  The regulations provide that supportability and consistency are the "most important factors."  20 C.F.R. § 404.1520c(b)(2).  In evaluating the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ..., the more persuasive the medical opinions … will be."  20 C.F.R. § 404.1520c(c)(1).  As for the consistency factor, "[t]he more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be."  20 C.F.R. § 404.1520c(c)(2).  The regulations oblige ALJ's to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions … in [the] determination or decision," while they "may, but are not required to, explain how [they] considered" the remaining factors.  20 C.F.R. § 404.1520(b)(2).  Thus, the new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'"  *Warren I. v. Comm'r of Soc. Sec.*, No. 5:20-CV-495 (ATB), 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01, 5858 (Jan. 18, 2017)).  The "ALJ's failure to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the plaintiff's] disability determination was supported by substantial evidence."  *Id*.

While Plaintiff cites to the wrong rule, she is correct that the ALJ's evaluation of Dr. Usmani's opinion is legally deficient.  The ALJ properly cited to 20 C.F.R. § 404.1520c, but he failed to comply with it.  In particular, the ALJ did not address the persuasiveness of Dr. Usmani's opinion with reference to consistency.  The ALJ gave four reasons for finding Dr.

Usmani's opinion "not persuasive," including the following: (1) that the opinion was "solicited to accommodate this application;" (2) that it was "generally inapposite to the contemporaneous observation of the claimant during actual, in-person sessions as noted in the longitudinal history;" (3) that it is "particularly indicative of accepting subjective complaints (e.g. Review of Systems), rather than reflecting actual findings on examinations;" and (4) that it is "rendered on a form provided by the claimant's representative, amounting to a checklist with scant analysis" (A.R. 36-37). While the second and third reasons relate to supportability without explicitly invoking it, none of the reasons address the consistency (or lack thereof) of Dr. Usmani's opinion with evidence from other medical and nonmedical sources.

Moreover, each of the reasons the ALJ did give for discounting Dr. Usmani's opinion is flawed. The ALJ's finding that Dr. Usmani's opinion was not persuasive because it was "solicited to accommodate this application" is problematic for two reasons (A.R. 36). First, as a factual matter, it is incorrect. Dr. Usmani was retained primarily as Plaintiff's primary care physician. "That [his] opinion[ ] w[as] also offered to support Plaintiff's disability claim does not in any way undermine [his] status as [a] long-term treating clinician[ ]." *Rivera v. Saul*, 475 F. Supp. 3d 71, 77 (D. Mass. 2020). Second, "the First Circuit has made it clear for at least three decades that medical evaluations cannot be discredited simply based on their 'timing and impetus' since it is 'quite common procedure to obtain further medical reports, after a claim is filed….'" *Id.* (quoting *Gonzalez Perez v. Sec'y of Health & Human Servs.*, 812 F.2d 747, 749 (1st Cir. 1987)). *See also K.A.B. by Bilodeau v. Saul*, No. CV 18-30174-KAR, 2020 WL 488740, at *11 (D. Mass. Jan. 30, 2020) (quoting *Lobov v. Colvin*, Civil No. 12-40168-TSH, 2014 WL 3386567, at *14 (D. Mass. June 23, 2014)) ("[I]t is 'impermissible for an ALJ to

disregard a treating source's opinion merely because it was solicited by the claimant's attorney.'").

The second reason given by the ALJ – that Dr. Usmani's opinion was "generally inapposite to the contemporaneous observation of the claimant during actual, in-person sessions, as noted in the longitudinal history above" – is not problematic in and of itself (A.R. 37). However, the ALJ did not explain in what way Dr. Usmani's opinions were inconsistent with the longitudinal medical history. Thus, the court cannot ascertain whether in fact there are material differences between Dr. Usmani's assessment of Plaintiff's functional limitations and care providers' contemporaneous observations of her impairments and limitations.

The ALJ's third reason was that Dr. Usmani's opinion was "particularly indicative of acceptance of subjective complaints (e.g. Review of Systems), rather than reflecting actual findings on examination" (A.R. 37). However, Plaintiff has been diagnosed with fibromyalgia. "[F]ibromyalgia limitations are 'of necessity based on the claimant's subjective allegations as [a] doctor's examinations of the claimant [are], with the exception of the presence of tender points, relatively benign.'" *Tegan S. v. Saul*, C.A. No. 20-307PAS, 2021 WL 2562426, at *5 (D.R.I. June 23, 2021) (quoting *Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2009)). It is error for an ALJ to discount subjective reports of pain in a fibromyalgia case because a lack of objective findings is "what can be expected in fibromyalgia cases.'" *Johnson*, 597 F.3d at 412-13. The ALJ's dismissal of Plaintiff's subjective complaints is particularly troubling here, where the ALJ did not believe Plaintiff's testimony about the intensity, persistence, and limiting effects of her pain (A.R. 39) but failed to "'make specific findings as to the relevant evidence he considered in determining to disbelieve the [Plaintiff]'" as required. *Harris v. Saul*, Civ. Action No. 18-11359-

PBS, 2019 WL 3429485, at *5 (D. Mass. July 30, 2019) (quoting *Da Rosa v. Sec'y of Health & Human Serv.*, 803 F.2d 24, 26 (1st Cir. 1986)).

Finally, the ALJ noted that Dr. Usmani's opinion was "rendered on a form provided by the claimant's representative, amounting to a checklist with scant analysis" (A.R. 37).  Courts in this circuit have afforded less weight to opinions expressed in checklist format.  *Mitchell v. Colvin*, Civ. Action. No. 16-10679-DJC, 2017 WL 3209458, at *6 n.4 (D. Mass. July 28, 2017) (citing *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 71-73 (D. Mass. 2004)).  However, the court disagrees with the ALJ's characterization of the form in question.  While the form does include checklist items, it also includes narrative questions asking the healthcare provider to identify the medical findings that support the identified exertional, postural, physical, and environmental limitations, and Dr. Usmani responded to each of these questions in significant detail (A.R. 1263-64).  It might be appropriate to discount some of the opinions on the form that do not ask for the medical findings supporting them (e.g., how often the patient will be absent from work due to his or her impairments or treatment), but it is improper to discount the entire form for this reason where Dr. Usmani identified the medical evidence he relied on to support his opinions on Plaintiff's functional limitations.

"When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency."  *Seavey v. Barnhart*, 276 F.3d 1, 12 (1st Cir. 2001) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).  However, "[w]hile an error of law by the ALJ may necessitate a remand, a remand is not essential if it will amount to no more than an empty exercise."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 656 (1st Cir. 2000) (internal citation omitted).  The court here cannot say that remand would be an empty exercise.  Even the ALJ's

more restrictive alternate RFC does not account for all the functional limitations identified by Dr. Usmani, limitations which, as explained above, the ALJ did not properly evaluate and discounted for improper reasons. For example, the alternate RFC provides that Plaintiff can sit, stand, and walk six hours in an eight-hour workday (A.R. 39-40), but Dr. Usmani opined that Plaintiff could only stand and walk for a maximum of three hours and sit for a maximum of four hours during an 8-hour day (A.R. 1263). The alternate RFC also does not account for Dr. Usmani's opinion that Plaintiff would need to lie down at unpredictable intervals every thirty to sixty minutes (A.R. 1263). The alternate RFC provides for occasional twisting and crouching, while Dr. Usmani opined that Plaintiff could never twist or crouch. Finally, the only upper extremity limitations included in the alternate RFC are that forceful grasping and twisting with the bilateral hands and wrists is limited to frequent but less than constant and no more than frequent but less than constant flexing of the right elbow. However, Dr. Usmani opined that Plaintiff was limited in fine manipulation (fingering), gross manipulation (handling), and peeling (A.R. 1263). Thus, because Dr. Usmani's opinion included functional limitations that were more restrictive than the alternate RFC, and the ALJ failed to meet the minimum level of articulation required by 20 C.F.F. § 404.1520(b)(2) in rejecting these limitations, the court is unable to determine if Plaintiff's disability determination is supported by substantial evidence.[6] Therefore, remand is appropriate in this case.

---

[6] The court notes that the ALJ similarly failed to comply with 20 C.F.R. § 404.1520(b)(2) with respect to the opinions of the state agency medical consultants, Drs. Hom and Gopal. In the decision, the ALJ finds the opinions "not persuasive as they are not supported by the medical evidence of the record as a whole" (A.R. 37). The ALJ offers no explanation for this boilerplate statement, and he does not articulate how he considered the consistency of the opinions with nonmedical evidence in the record or the supportability of the opinions.

   B.  The ALJ's Step Four Finding

Because the ALJ's evaluation of Dr. Usmani's opinion on its own warrants remand, the court need not address Plaintiff's other argument.

**V.     Conclusion**

For the reasons stated above, Plaintiff's motion for judgment on the pleadings (Dkt. No. 19) is ALLOWED and Defendant's motion to affirm the Commissioner's decision (Dkt. No. 27) is DENIED.  The case is remanded for further proceedings consistent with this memorandum and order.  In particular, the ALJ is directed to consider the relevant factors and specifically explain how he considered the supportability and consistency factors as to each medical opinion per 20 C.F.R. § 404.1520c(b)(2).  The Clerk's Office is directed to close the case on this court's docket.

It is so ordered.

Dated:  October 29, 2021                              /s/ Katherine A. Robertson____
                                                     KATHERINE A. ROBERTSON
                                                     United States Magistrate Judge